**Darrell WESSINGER, Plaintiff,**

v.

**VETTER CORPORATION; Vetter Products, Inc.; American Honda Motor Co., Inc.; Honda Motor Company, Ltd.; and Honda Research & Development Co., Ltd., Defendants.**

No. 86–2385.

United States District Court,
D. Kansas.

Dec. 17, 1987.

Dennis L. Davis, Daniel P. Wheeler, Hillix, Brewer, Hoffhaus, Whittaker & Horner, Kansas City, Mo., Homer C. Bittiker, Bittiker & McAdam, Overland Park, Kan., for plaintiff.

Charles O. Thomas, Edmund S. Gross, Thomas, McDonald, Maier, Dykes & Johnston, Thomas O. Baker, Evan A. Douthit, R. Douglas Gentile, Baker & Sterchi, Kan-

sas City, Mo., Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, Kan., Edward M. Boddington, Jr., Boddington & Brown, Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

### EARL E. O'CONNOR, Chief Judge.

This matter is before the court on several motions by various parties in the above-captioned case. Plaintiff Darrell Wessinger [hereinafter "Wessinger"] moves the court to grant him leave to amend his first amended complaint. Defendant Vetter Products, Inc., [hereinafter "VPI(2)"] opposes Wessinger's motion and moves for summary judgment as to his claims against it. Defendant Honda Research & Development Co., Ltd., [hereinafter "Honda R & D"] moves for dismissal of Wessinger's claims against it for lack of personal jurisdiction.

The pertinent facts are as follows: Wessinger, a Kansas resident, purchased a 1975 Honda motorcycle equipped with a "Windjammer" fairing on June 14, 1985. Later that day, Wessinger was injured when his motorcycle collided with an automobile.

Wessinger brought this action against Vetter Corporation [hereinafter "Vetter"], VPI(2), American Honda Motor Co., Inc. [hereinafter "American Honda"], Honda Motor Company, Ltd. [hereinafter "Honda"], and Honda R & D, primarily alleging that his injuries were caused by the fairing, which allegedly "deflected, deformed, bent and collapsed."

Vetter was incorporated in Illinois, where its principal place of business was until January 1983. Vetter designed, manufactured, and sold "Windjammer" fairings, including the fairing on Wessinger's motorcycle. In January 1983, Vetter applied for bankruptcy.

On January 24, 1983, Vetter Products, Inc., [hereinafter "VPI(1)"] was incorporated in California. Phillip Matthews [hereinafter "Matthews"], William Zimmerman [hereinafter "Zimmerman"], and James Galbraith [hereinafter "Galbraith"] were the only shareholders, directors, and officers of VPI(1). Matthews, Zimmerman, and Galbraith were never shareholders, directors, or officers of Vetter.

On February 14, 1983, VPI(1) purchased Vetter assets, including all of Vetter's machinery, equipment, tooling, fixtures, accounts receivable, contractual rights, inventory, intangibles, documents, patent and trademark rights, cash and bank deposits, and office and plant real property. VPI(1) paid the $12,000,000 purchase price by assuming Vetter's liability for a $12,000,000 note and mortgage payable. No shares of VPI(1) stock were given to Vetter or its shareholders, directors, or officers in connection with the transaction. VPI(1) manufactured and sold fairings carrying the "Windjammer" name following the Vetter purchase.

On September 13, 1983, VPI(1) changed its name to Vetter Holdings, Inc., [hereinafter "Vetter Holdings"]. On the same date, defendant VPI(2), another California corporation, was formed. VPI(2) was a wholly-owned subsidiary of Vetter Holdings.

On November 21, 1984, Vetter Holdings adopted a plan of dissolution whereby (1) all assets of Vetter Holdings other than VPI(2) stock were assigned to VPI(2), (2) pursuant to a stock purchase agreement, 7,826 shares of VPI(2) stock were sold to Bell Helmets, Inc. [hereinafter "Bell Helmets"], and (3) pursuant to another stock purchase agreement, 2,174 shares of VPI(2) stock were sold to Bell Helmets International, Inc. [hereinafter "Bell International"]. On the same date, Bell International sold its 2,174 shares of VPI(2) stock to Bell Helmets, making Bell Helmets the sole owner of all VPI(2)'s stock. Additionally, Bell International was merged into Bell Helmets.

Defendant Honda is a Japanese corporation which manufactures and sells motorcycles and motorcycle products and parts. Defendant American Honda, a California corporation, is a wholly-owned subsidiary of Honda and the Honda distributor in the United States. Defendant Honda R & D, a Japanese corporation, is a wholly-owned subsidiary of Honda and the designer of

Honda motorcycles and motorcycle products and parts.

## I. *VPI(2)'s Motion.*

Wessinger moves the court for leave to amend his First Amended Complaint to include as defendants Vetter Holdings and Bell Helmets. VPI(2) opposes this motion and relatedly moves the court for summary judgment as to Wessinger's claims against it. We initially consider VPI(2)'s summary judgment motion, as our holding on this motion affects our holding on Wessinger's amendment motion.

VPI(2) contends that its liability is contingent on VPI(1), a predecessor of Vetter Holdings and VPI(2), assuming successor liability when it purchased Vetter's assets. VPI(2) asserts that successor liability is not proper in this case. Wessinger responds that summary judgment is unwarranted because sufficient issue remains as to whether successor liability should be applied here. Additionally, he asserts that VPI(2) had a duty to warn customers of the dangers of "Windjammer" fairings.

When considering a motion for summary judgment, we must examine all evidence in the light most favorable to the opposing party. *Prochaska v. Marcoux*, 632 F.2d 848, 850 (10th Cir.1980), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981). If the moving party bears the burden of proof at trial, he must show, through pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* Fed.R. Civ.P. 56(c). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). This burden is met when the moving party identifies those portions of the record demonstrating an absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

If the moving party meets his requirement, the burden shifts to the nonmoving party, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (emphasis added). The trial judge then determines whether a trial is needed—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511, 91 L.Ed.2d at 213.

### A. *Controlling law.*

██ This court has diversity jurisdiction over this action pursuant to Title 28, United States Code, Section 1332. In a diversity action, the federal court follows the conflict of laws principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 1022, 85 L.Ed. 1477 (1941). In Kansas, the conflicts rule for tort cases against a manufacturer is *lex loci dilecti*, meaning the place of the wrong; thus Kansas law governs Wessinger's claims against Vetter. *See Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731, 735 (1985) (citing *McDaniel v. Sinn*, 194 Kan. 625, 400 P.2d 1018 (1965)). In cases of corporate transfer and successor liability, the law of the place of the transfer governs. *See Brown v. Kleen Kut Manufacturing Co.*, 238 Kan. 642, 646, 714 P.2d 942, 945 (1986). Thus Illinois law covers VPI(2)'s asserted successor liability.

### B. *Successor liability.*

██ A corporation which acquires the assets of another is generally not liable for the debts and liabilities of the transferor under Illinois law. *Green v. Firestone Tire and Rubber Co.*, 122 Ill.App.3d 204, 77 Ill.Dec. 591, 594, 460 N.E.2d 895, 898 (1984); *Gonzalez v. Rock Wool Engineering & Equipment Co.*, 117 Ill.App.3d 435, 72 Ill.Dec. 917, 920, 453 N.E.2d 792, 795 (1983). However, exceptions have been recognized where (1) there is an express or implied agreement of assumption, (2) the transaction is essentially a consolidation or merger, (3) the purchaser is a mere contin-

uation of the seller, or (4) fraudulent purposes underlie the transaction. *Id.*

In the instant case, VPI(2) did not expressly or impliedly assume liability for tort actions asserted against Vetter. Although it did assume liability for Vetter's bank note obligtion, this assumption does not imply assumption of tort liability. Additionally, no evidence exists indicating that the transaction was fraudulent.

■ Thus the only exceptions potentially applicable are the merger and continuation exceptions. These exceptions are inseverable. *Green*, 77 Ill.Dec. at 595, 460 N.E.2d at 899. The criteria for a *de facto* merger are: (1) continuity of the business enterprise between the buyer and the seller, including continuity of management, employees, location, and assets; (2) continuity of shareholders, meaning the shareholders of the seller become the shareholders of the buyer; (3) the seller ceases operations and dissolves soon after the transfer; and (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business. *Gonzalez*, 72 Ill.Dec. at 920–21, 453 N.E.2d at 795–96; *Manh Hung Nguyen v. Johnson Machine and Press Co.*, 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 868–69, 433 N.E.2d 1104, 1106–07 (1982).

■ In the instant case, the second requirement, continuity of shareholders, is unsatisfied. VPI(1)'s only shareholders were Marshall, Zimmerman, and Galbraith, and they were not shareholders of Vetter. Continuity of shareholders is likely the most important requirement for a *de facto* merger. *Nguyen*, 60 Ill.Dec. at 870, 433 N.E.2d at 1108. The *Nguyen* court correctly characterized the situation:

> When one corporation merely sells its assets to another, the corporate entity that had liabilities does not become a part of the successor. All that has transferred is the business, which is not an entity that has liabilities. As entities with liabilities, the predecessor and successor remain separate and distinct. There is little logic and little justice in requiring the successor to assume the liabilities of the predecessor. The suc-

cessor has paid a substantial price for the assets of the predecessor, and the law should not require the successor to pay a greater price, especially after the fact of sale when it is impossible for the successor to return to negotiations to change the price. Left behind is the predecessor corporation with money in hand. It should meet whatever liabilities it had with the price it has exacted. Its shareholders should ultimately suffer the losses from liabilities the corporation had, not the shareholders of the successor. Of course, if the predecessor chooses to dissolve, with dissolution comes the destruction of all pre-existing liabilities.... Nevertheless, the legislature has given a party with a claim against the dissolving corporation two years following dissolution in which to assert his claim.

*Id.* (citations omitted). Thus here, the proper approach for Wessinger was to assert his action against Vetter within two years of its dissolution under Ill.Rev.Stat. ch. 32, par. 157.94 (1979). However, this was impossible because he was injured more than two years after Vetter's transfer and dissolution. Herein lies the injustice of the Illinois approach to successor liability: shareholders of dissolved corporations can too easily escape strict tort liability. Nevertheless, Illinois courts have continued to adhere to this approach even after acknowledging its shortcomings, *see id.; see also Green*, 77 Ill.Dec. at 597, 460 N.E.2d at 901 (listing cases where Illinois courts have struggled with the successor liability issue), and we will not depart from it here. Thus the *de facto* merger exception is not applicable, and VPI(1) assumed no successor liability when it purchased Vetter assets. Summary judgment for VPI(2) is therefore warranted as to Wessinger's claims of successor liability, because VPI(2) has no liability if its parents' predecessor, VPI(1), has no liability.

### C. *Duty to Warn.*

■ Wessinger asserts that VPI(2) had a duty to warn customers of the alleged dangers associated with the use of "Windjam-

mer" fairings on Honda motorcycles. Any such duty would arise only because of VPI(2)'s status as a successor to Vetter, and thus the law of Illinois controls this issue. Illinois courts appear to have endorsed imposing a duty on a successor corporation to warn of defects in the predecessor's products in certain situations. *See Gonzalez*, 72 Ill.Dec. at 920, 453 N.E.2d at 795 (listing the factors to be considered in determining the duty to warn issue, but declining to impose the duty given the facts); *Nguyen*, 60 Ill.Dec. at 871, 433 N.E.2d at 1109 (acknowledging in dicta that successors may have a duty to warn). The following factors are relevant in determining whether a duty to warn exists: (1) succession to a predecessor's service contracts, (2) coverage of the product under a service contract, (3) service of the product by the purchaser corporation, and (4) the purchaser corporation's knowledge of the defect and the location of the product's owner. *Gonzalez*, 72 Ill.Dec. at 920, 453 N.E.2d at 795.

■ Wessinger has offered evidence that VPI(2) supplies replacement parts and repair kits to retail sellers of "Windjammer" fairings. However, this is not sufficient for Wessinger to avoid summary judgment. In *Gonzalez v. Rock Wool Engineering & Equipment Co.*, the court held that there was no duty to warn because the successor/defendant did not maintain a continuing relationship with the plaintiff, who purchased from the predecessor corporation. *Id.* The court stated that although the successor offered to customers in general continued service and maintenance of the products, there was no indication of acceptance by the plaintiff. *Id.* In the instant case, even less evidence indicating a relationship exists. VPI(2) merely supplied retailers, not retail customers, with replacement parts and repair kits. There is no indication that Vetter had a relationship with retail customers, that VPI(2) maintained the relationship or began its own relationship as to customers in general, or that VPI(2) maintained or started any relationship with Wessinger. Thus there is no basis for a duty to warn, and summary judgment for VPI(2) is warranted.

## II. *Wessinger's Motion.*

Wessinger moves the court to amend his complaint to include as defendants Vetter Holdings and Bell Helmets. Both of these corporations were successors to VPI(1), and because it has no successor liability, they have none. Additionally, no evidence suggests that they maintained or began any relationship with Wessinger, and thus they have no duty to warn. Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." However, here, amendment would be futile because summary judgment for the added defendants would be warranted. Thus Wessinger's motion is denied.

## III. *Honda R & D's Motion.*

Honda R & D moves the court to dismiss Wessinger's action against it for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b). Wessinger bears the burden of proof regarding personal jurisdiction. *Hoffman v. United Telecommunications, Inc.*, 575 F.Supp. 1463, 1469 (D.Kan.1983). However, he need only make a prima facie case that the constitutional and statutory requirements for the assumption of personal jurisdiction are met. *Id.* (citing cases). In ruling on whether Wessinger has met this burden, the allegations of his complaint, except as controverted by Honda R & D's affidavits, are regarded as true. *See Black v. Acme Markets, Inc.*, 564 F.2d 681, 683 n. 3 (5th Cir.1977) (citing *Edwards v. Associated Press*, 512 F.2d 258, 262 n. 8 (5th Cir.1975); *O'Hare International Bank v. Hampton*, 437 F.2d 1173 (7th Cir. 1971), among others); *Allen v. Toshiba Corp.*, 599 F.Supp. 381, 386 n. 8 (D.N.M. 1984). Additionally, we will consider affidavits untimely submitted by both parties.

In considering personal jurisdiction questions in diversity actions, a two-step analysis is applied:

First, it must be determined whether the defendant's contacts with the forum are sufficient to satisfy the minimum contact tests of *International Shoe [Co. v.*

*Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ], and, second, the court must determine whether the defendants' conduct falls within the scope of service authorized by statute. *Hoffman,* 575 F.Supp. at 1469; *see also Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (the minimum contacts requirement extends to federal courts sitting with diversity jurisdiction).

### A. *Minimum contacts under International Shoe.*

■ Our initial focus is on the minimum contacts test of *International Shoe* and its progeny, which requires that a defendant in a state court action have sufficient contacts with the forum state such that the suit "does not offend 'traditional notions of fair play and substantial justice.'" *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940))). The key question is whether it is "reasonable, in the context of our federal system of government, to require the corporation to defend the particular [diversity] suit which is brought [in the federal district court of the forum state]." *International Shoe,* 326 U.S. at 317, 66 S.Ct. at 158. The court must consider several factors, including

the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, ——, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92, 105 (1987) (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564).

Wessinger asserts that the court has jurisdiction because Honda R & D has registered two patents in the United States, thus giving it direct contacts with Kansas. However, Wessinger's complaint makes no mention of the patents, and Wessinger has filed no affidavits supporting his contentions. We are unwilling to assert personal jurisdiction merely on the basis of unsupported contentions included in a memorandum.

Wessinger also contends that the court has jurisdiction under a stream of commerce theory. Honda R & D argues that it places no products into the stream of commerce, and, more importantly, that the Supreme Court has rejected this theory.

The stream of commerce theory was discussed at length in *Cunningham v. Subaru of America, Inc.,* 631 F.Supp. 132 (D.Kan.1986). There, the plaintiff sought damages allegedly suffered because of the design, manufacture, and distribution of the Subaru "Brat" truck. Defendant Fuji, a Japanese corporation, designed, manufactured, and sold completed Subaru automobiles to defendant Subaru of America, Inc. [hereinafter "SOA"]. The court summarized the parties' assertions as follows:

In support of its motion, defendant states that it has no contacts whatsoever with the State of Missouri, [sic] State of Kansas, and that the only contact with the entire United States is its sale of Subaru vehicles to defendant S.O.A. in Tokoyo [sic], Japan. The defendant claims that the fact that some of the vehicles sold by S.O.A. may have been used in the State of Kansas is insufficient to subject Fuji to jurisdiction of this court. Thus, Fuji contends it does not have the requisite minimum contacts to be subject to the jurisdiction of the courts of Kansas or Missouri.

Plaintiff, to the contrary, contends that defendant Fuji has sufficient minimum contacts with the State of Kansas or Missouri that requires [sic] it to defend itself in the United States District [Court] for the District of Kansas. The plaintiff contends that defendant Fuji's contacts with the States of Kansas and Missouri are substantial, continuous and revenue-producing. In support, plaintiff states that defendant Fuji produces Su-

baru motor vehicles and sells them to defendant Subaru of America in Tokoyo [sic], Japan. Plaintiff further contends that S.O.A. is the *exclusive* distributor of Fuji motor vehicles in the United States. S.O.A., in turn, sells motor vehicles to regional distributors throughout the United States.

*Id.* at 134.

The court ruled that it had personal jurisdiction under the stream of commerce theory:

Upon a review of *Worldwide Volkswagen* and its progeny, the court finds that Fuji's sale to S.O.A., its efforts to put Subaru vehicles into the stream of U.S. commerce, and its encouragement of such sales and revenue, evidences [sic] Fuji's affirmative intent that goods reach the individual states of the United States. It thus must reasonably anticipate being haled into court in those states in which one of its vehicles causes injury to a consumer.

. . . .

While Fuji greatly profits from the sale of Subaru Brat vehicles in the United States, it claims that it is immune from all jurisdictional claims against it in the United States. The court views this as a company which seeks to reap all of the benefits without incurring the resulting liabilities and costs. . . .

The court finds that Kansas' interest in asserting jurisdiction over Fuji in this action is substantial. Any inconvenience to defendant in defending this lawsuit is clearly outweighed by Kansas' interest in protecting its citizens from injury. The court finds that it would be fundamentally unfair to allow a foreign manufacturer to insulate himself from the jurisdiction of this court by use of an exclusive distributor. The court therefore finds that defendant Fuji's motion to dismiss for lack of personal jurisdiction should be denied.

*Id.* at 135–36.

The facts and the parties' contentions in the instant case strongly resemble those in *Cunningham*. However, Honda R & D invites us to ignore the *Cunningham* ruling for three reasons: (1) Wessinger, unlike the *Cunningham* plaintiff, has failed to meet his burden of proof, (2) the *Cunningham* court relied on *Asahi Metal Industry Co. v. Superior Court*, 39 Cal.3d 35, 702 P.2d 543, 216 Cal.Rptr. 385 (1985), for support for its stream of commerce theory, and the Supreme Court reversed the California Supreme Court and rejected the stream of commerce theory in *Asahi*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), and (3) the facts in the instant case are significantly different because Honda R & D, unlike Fuji in *Cunningham*, did not manufacture the motorcycle.

As to the burden of proof, the *Cunningham* opinion does not articulate the level of proof the court required. In any event, as stated above, we consider the portions of Wessinger's complaint uncontroverted by affidavits as true and the affidavit he submitted as timely. Additionally, Honda R & D submitted to the court a Kansas District Court opinion which held, under similar facts, that Honda R & D did not have sufficient contacts to be haled into Kansas court. Because Honda R & D invites us to adopt the court's reasoning, we assume it agrees with the court's characterization of the relationship among the Honda corporations. In sum, sufficient facts regarding the relationship and the corporations' actions are before the court.

Honda R & D also asserts that in *Asahi*, the Supreme Court rejected the stream of commerce theory relied on in *Cunningham*. However, examination of the *Asahi* opinion reveals that the court was evenly divided as to the validity of the theory.

Justice O'Connor wrote for an eight-Justice majority (Justice Scalia did not join this portion of the opinion) that, given the facts, the California state court's assertion of jurisdiction over Asahi, a Japanese corporation, would offend the *International Shoe* notions of fairness and reasonableness. *See Asahi*, 480 U.S. at —— – ——, 107 S.Ct. at 1033–35, 94 L.Ed.2d at 105–07. Asahi, the manufacturer of a motorcycle tire tube valve assembly, and Cheng Shin, a Taiwanese corporation and the manufacturer of the tube, were sued by Zurcher, a

California resident, in California state court in connection with a motorcycle accident. Zurcher's claims were settled, leaving only Cheng Shin's indemnity action against Asahi. The court concluded that

> [c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over Asahi in this instance would be unreasonable and unfair.

*Id.* at ——, 107 S.Ct. at 1035, 94 L.Ed.2d at 107. In the instant case, the facts are quite different. Both Wessinger's and Kansas' interests are much greater than Chang Shin's and California's were in *Asahi* because Wessinger is a Kansas resident.

In a separate portion of her opinion, Justice O'Connor, joined by the Chief Justice and Justices Powell and Scalia, wrote that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at ——, 107 S.Ct. at 1033, 94 L.Ed.2d at 104. Thus the California court's assertion of personal jurisdiction over Asahi exceeded the limits of due process. *Id.* at ——, 107 S.Ct. at 1033, 94 L.Ed.2d at 105.

However, Justices Brennan, White, Marshall, and Blackmun disagreed with this portion of the opinion. Writing for the group, Justice Brennan stated:

> I cannot join the plurality's determination that Asahi's regular and extensive sales of component parts to a manufacturer it knew was making regular sales of the final product in California is insufficient to establish minimum contacts with California.

*Id.* at ——, 107 S.Ct. at 1037–38, 94 L.Ed.2d at 110 (Brennan, concurring in part). Justice Stevens, joined by Justices White and Blackmun, did not reach the issue of the validity of the stream of commerce theory, stating that it was unnecessary to the Court's decision. *Id.* (Stevens, concurring in part).

Thus the *Asahi* Court was evenly divided as to the validity of the theory. Given this, and noting that most courts and commentators support the theory, *see id.* at ——, 107 S.Ct. at 1036, 94 L.Ed.2d at 108 (Brennan, concurring in part), we decline to depart from the *Cunningham* ruling that the theory validly confers jurisdiction.

Honda R & D further asserts that *Cunningham* is not controlling here because Honda R & D, unlike Fuji, did not manufacture the motorcycle. We disagree and hold that we have personal jurisdiction because Honda R & D's design was a product, the product was indirectly placed into the stream of commerce, and the product allegedly injured Wessinger.

First, Honda R & D's design may be likened to a component of the Honda motorcycle; in fact, it is a component which controls all other components. *See Asahi*, 480 U.S. at ——, 107 S.Ct. at 1037, 94 L.Ed.2d at 110 (Brennan, concurring in part) (the sale of component parts to a manufacturer with knowledge that the manufacturer's end product will regularly be sold in the forum sufficiently establishes minimum contacts). Viewed as such, the design is a product.

Second, Honda R & D indirectly placed the product into the stream of commerce. It regularly sold its designs to its parent, Honda, which manufactured motorcycles from the designs and sold the motorcycles to American Honda, another wholly-owned subsidiary, which distributed the motorcycles throughout the United States. Given the relationship among the corporations, Honda R & D undoubtedly knew that the finished products made from its design would regularly be sold in Kansas. *See Cunningham*, 631 F.Supp. at 135–36. Because of the absence of evidence regarding the issue, we do not here hold that Honda R & D, Honda, and American Honda are so tightly related that the subsidiaries are mere alter-egos of the parent. *See Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483 (D.Kan.1978) (extensively explaining and applying the alter-ego theory); *Allen v. Toshiba*, 599 F.Supp. 381, 390–92 (D.N.M.1984) (explaining but declining to apply the alter-ego theory). Rather, we simply refer to the relationship

to support our conclusion that Honda R & D knowingly, regularly, and indirectly placed its component product, the design, into the stream of commerce.

Third, Honda R & D's product, the design, is an alleged source of Wessinger's injuries. Wessinger contends that he was injured because of the fairing, and that Honda R & D designed motorcycles with the knowledge and intention that "Windjammer" fairings would be installed. Further, he asserts that Honda R & D knew the design of "Windjammer" fairings, and it failed to design motorcycles that would be adequately safe if equipped with the fairings. "[I]t is not unreasonable to subject [Honda R & D] to suit in [Kansas] if its allegedly defective merchandise [ (the design for use with "Windjammer" fairings) ] has been the source of injury to its owner or to others." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. Thus *Cunningham* controls this case even though Honda did not manufacture the motorcycle.

In summary, the court, applying the principles articulated by the Supreme Court in *Asahi,* 480 U.S. at ——, 107 S.Ct. at 1033, 94 L.Ed.2d at 105, finds that the interests of Wessinger in obtaining relief and of Kansas in protecting its citizens from injury by inadequately designed products are substantial and outweigh any inconvenience or burden on Honda R & D. Thus the court concludes that Honda R & D's contacts are sufficient to satisfy the minimum contacts test of *International Shoe.*

### B. *The Kansas Long–Arm Statute.*

We next address whether Honda R & D's conduct falls within the scope of service authorized by the Kansas long-arm statute, K.S.A. 60–308(b)(7), which provides:

(b) *Submitting to jurisdiction—process.* Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:

. . . .

(7) causing to persons or property within this state any injury arising out of an act or omission outside of this state by the defendant if, at the time of the injury either (A) the defendant was engaged in solicitation or service activities within this state; or (B) products, materials or things processed, serviced or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of trade or use....

This statute is to be liberally construed, and it reflects a "conscientious state policy to assert jurisdiction over non-residence defendants to the extent permitted by the due process clause of Fourteenth Amendment." *Woodring v. Hall,* 200 Kan. 597, 600, 438 P.2d 135, 141 (1968), *quoted in Schlatter v. Mo-Comm Futures Ltd., Inc.,* 233 Kan. 324, 329, 662 P.2d 553, 558 (1983). Thus, because Honda R & D may properly be haled into this court under *International Shoe* and the fourteenth amendment, the requirements of the Kansas long-arm statute are satisfied. We therefore deny Wessinger's motion to dismiss for lack of jurisdiction.

IT IS THEREFORE ORDERED that VPI(2)'s motion for summary judgment is granted.

IT IS FURTHER ORDERED that Wessinger's motion to amend his first amended complaint is denied.

IT IS FURTHER ORDERED that Honda R & D's motion to dismiss for lack of personal jurisdiction is denied.