**Kobe FALCO, individually, and on behalf of a class similarly situated individuals, Plaintiff,**

**v.**

**NISSAN NORTH AMERICA INC., Nissan Motor Co. Ltd, a Japanese Company, Defendants.**

Case No. CV 13–00686 DDP (MANx).

United States District Court, C.D. California.

Signed April 6, 2015.

See also 987 F.Supp.2d 1071, 2013 WL 5575065.

**1056**

Mark P. Pifko, Natasha Mehta, Roland K. Tellis, Michael I. Miller, Baron and Budd PC, Encino, CA, Cody R. Padgett, Jordan L. Lurie, Capstone Law APC, Karen Emily Nakon, Larry Chae, Michael G. Devlin, Payam Shahian, Ramtin Shahian, Strategic Legal Practices APC, Los Angeles, CA, Dara Tabesh, Erotech Law Group PC, San Francisco, CA, for Plaintiff.

E. Paul Cauley, Jr., Sedgwick LLP, Dallas, TX, James L. Nelson, Sedgwick LLP, Los Angeles, CA, Jia–Ming Shang, Nora E. Wetzel, Paul J. Riehle, Sedgwick LLP, San Francisco, CA, for Defendant Nissan North America Inc.

## ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS UNDER RULES 12(b)(2) AND 12(b)(6) [Dkt. Nos. 99, 100]

DEAN D. PREGERSON, District Judge.

Presently before the Court are two Motions to Dismiss the Second Amended Complaint as to Nissan Motor Co. Ltd. ("NML"), one for lack of personal jurisdiction and one for failure to state a claim. (Dkt. Nos. 99, 100.) Having heard oral arguments and considered the parties' submissions, the Court adopts the following order.

## I. BACKGROUND

The Court has already set out the background facts of this case in its order of October 10, 2013, and they remain largely the same. Briefly, the named Plaintiffs purchased four Nissan vehicles between 2005 and 2007 that shared in common a particular kind of timing chain system, which they allege was prone to failure and put consumers at risk. *Falco v. Nissan N. Am. Inc.*, No. CV 13–00686 DDP MANX, 2013 WL 5575065, at *1–2 (C.D.Cal. Oct. 10, 2013). They bring this action under various California and Washington consumer protection statutes on behalf of themselves and others similar situated. (Second Amended Complaint ("SAC") at 1.)

NML is the parent company of Nissan North America ("NNA"), which sells Nissan products in the United States. (*Id.* at ¶ 21.) NML was a Defendant in the original state complaint in this case. (Dkt. No. 1.) After NML filed a motion asserting that the Court lacked jurisdiction over it, (Dkt. No. 27), the Court ordered limited discovery to establish the jurisdictional facts. (Dkt. No. 65.) While that discovery was under way, the Supreme Court issued its opinion in *Daimler AG v. Bauman*, —— U.S. ——, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). NML argued *Bauman* foreclosed any possibility of general jurisdiction. (Dkt. No. 78.) The parties therefore stipulated to dismiss NML as a defendant, but with leave for Plaintiffs to re-add NML in a future amended complaint. (Dkt. Nos. 83, 86.) A few months later, Plaintiffs filed the SAC, which did add NML back as a defendant. (Dkt. No. 90.) The present motions followed.

## II. LEGAL STANDARD

### A. Personal Jurisdiction

██ A court in a given "forum state" may exercise specific personal jurisdiction over a non-resident defendant if the following conditions are met:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.2004). A plaintiff bears the burden of establishing the first two prongs; the burden then shifts to the defendant to show that the exercise of jurisdiction would be unreasonable. *Id.*

### B. Motions to Dismiss

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir.2000). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that re-

quires the reviewing court to draw on its judicial experience and common sense." *Id.* A complaint need not include "detailed factual allegations," but it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678, 129 S.Ct. 1937. Statements of legal conclusions "are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937.

## C. Rule 9(b)

 Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. Personal Jurisdiction over NML

Plaintiffs, having conducted limited discovery against NML as to jurisdiction, have filed the SAC adding NML back in as a Defendant in this action. Plaintiffs proceed under a theory of specific jurisdiction, because, as the parties appear to agree,[1]

NML was intimately involved with the design and testing of the timing chain system at issue. NML argues that there is no specific jurisdiction, because it *only* participated in design choices and "never manufactured, distributed, sold, or warranted" any of the vehicles in question. (Reply ISO Mot. Dismiss Rule 12(b)(2) at 1:10–11.) Defendant argues that the "stream of commerce" theory of personal jurisdiction on which Plaintiff relies only applies to an entity that "actually *placed* the product into the stream of commerce." (*Id.* at 3:1–2.)

 At the outset, the Court notes that Plaintiffs do not concede that all physical fabrication was done solely by NNA. (Opp'n at 20, n. 4.) But even if it was, that does not foreclose a finding that NML "manufactured" the vehicles and components in question. Design is a critical portion of the manufacturing process; without design, there is simply nothing to manufacture. Indeed, the defining characteristic of a manufactured good is the imposition of a man-made pattern, form, or design onto raw materials.[2] NML's attempt to separate its control over the design and testing phases of manufacturing from the physical act of fabricating the vehicles, and to insist that only the latter qualifies as "manufacturing" or "putting a product into the stream of commerce," is therefore unconvincing—at least on these facts. This is not, for example, a case where a wholly independent designer sells

---

1. *See* Reply ISO Mot. Dismiss Rule 12(b)(2) at 1:7–9 (NML has "never denied" that it "had design 'release responsibility' for the design of the vehicles").

2. *Black's Law Dictionary* 1109 (10th ed.2014) (defining a "manufacture" as "any material form produced … from an unshaped composition of matter"). A district court in Kansas, confronted with a case in which a foreign company had provided the design for a motorcycle built by a sibling U.S. company, held

that it had personal jurisdiction because "Honda R & D's *design* was a product…. Honda R & D's design may be likened to a *component* of the Honda motorcycle; in fact, it is a component which controls all other components." *Wessinger v. Vetter Corp.,* 685 F.Supp. 769, 777 (D.Kan.1987) (emphases added). The Court need not adopt the holding of *Wessinger* to resolve this case, but that holding does provide one metaphor for thinking about the key role of design in manufacturing.

a product design to another company and is completely uninvolved in the production of the physical product thereafter.[3] Rather, Plaintiff's evidence shows that NML took almost total responsibility for the relevant components up through the initial production release,[4] NML conducted testing of the components,[5] NML had authority over the manufacturing process, because parts and vehicles could not be manufactured without NML's "release," [6] NML appears to have been involved in monitoring the manufacturing plant,[7] and NML had the final authority to change or decline to change the manufacture of faulty parts, including for pricing reasons.[8] NML has produced no evidence .to the contrary on any of these points.

Thus, the Court finds that NML, at the very least, participated in manufacturing the vehicles in question (and possibly warranting them as well), and has therefore placed them into the stream of commerce.

■ That would not matter, of course, if NML had not aimed its efforts at the California market. *See, e.g., J. McIntyre Mach., Ltd. v. Nicastro,* — U.S. —, 131 S.Ct. 2780, 2790, 180 L.Ed.2d 765 (2011) (Kennedy, J., plurality opinion) (no jurisdiction because "[r]espondent has not established that J. McIntyre engaged in conduct purposefully directed at" the forum state). "The placement of a product into

the stream of commerce, without more, is not an act purposefully directed toward a forum state." *Holland America v. Wärtsilä North America, Inc.,* 485 F.3d 450, 459 (9th Cir.2007). In this case, however, the Court concludes that this requirement is satisfied, because NML "purposely direct[ed]" its activities at the forum state. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir.2004).

NML appears to have used NNA as a "distributor who has agreed to. serve as the sales agent in the forum State" for the vehicles that NML helped to manufacture. *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (O'Connor, J., plurality opinion). According to deposition testimony, NML intends for the components at issue to be sold in California. (Decl. Mark Pifko, Ex. 5 at transcript pages 35–36.) NNA is "the sole authorized distributor of Nissan and Infiniti vehicles in the United States, including California." (Dkt. No. 27–1, Decl. Shiho Kobayashi, ¶ 17.) And that distribution relationship is not simply a hands-off parent-subsidiary relationship. Half the members of NNA's Board of Directors also sit on NML's Board of Directors. (Dkt. No. 27–1, Decl. Shiho Kobayashi, ¶ 13–14.) Plaintiffs allege, and NML does not deny, that NML and NNA worked

---

3. *See, e.g., Lyons v. Rienzi & Sons, Inc.,* 856 F.Supp.2d 501, 506, 510 (E.D.N.Y.2012) (declining to find specific jurisdiction over Italian company that sold its yacht design to an unrelated Wisconsin firm for $30,000 and had no further hand in the process).

4. Decl. Mark Pifko, Ex. 1 at transcript page 54.

5. Pifko Decl., Ex. 1 at transcript page 56.

6. Pifko Decl., Ex. 1 at transcript pages 25–26 (NML was the entity that gave "approval to use [particular] parts on an engine or a vehicle").

7. Pifko Decl., Ex. 1 at transcript page 27.

8. Pifko Decl., Ex. 2 (NML had authority to reject a proposed "countermeasure" in 2003); *Id.,* Ex. 5 at transcript page 140 (same); *Id.,* Ex. 7 (manufacturing change proposed by NNA and third-party contractor, but NML "resisted" and the change was not adopted); *Id.,* Ex. 5 at transcript pages 81–82 (NNA's design team did not have "budgetary responsibility" for the components in question because they didn't have "design responsibility," while NML *did* have design responsibility and took into account the impact of design changes on the budgeted "piece price").

closely together on "the distribution, sale, lease, servicing, and warranting of the Subject Nissan Vehicles." (SAC, ¶ 23.) NML appears to engage in direct advertising aimed at the American market, including California, for at least some of the vehicles at issue—which are necessarily distributed by NNA. (Dkt. No. 40–3.) NML also puts out press releases touting the activities of NNA (often referred to simply as "Nissan") in the United States, including in California. (Decl. Mark Pifko, Exs. 10–11.) Taken as a whole, the evidence shows "additional conduct" that "indicate[s] an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. 102, 112, 107 S.Ct. 1026 (1987).[9]

■ The rest of the elements of specific jurisdiction follow naturally. Because NML was involved in and had authority over the manufacturing process, used NNA as its distribution agent, and appears to have taken part in the marketing of the vehicles, with the intent of selling them in California, Plaintiffs' claims under various consumer protection statutes arise out of and/or relate to NML's forum-related activities. *Schwarzenegger*, 374 F.3d at 802.

■ Finally, given all the above, NML has not shown that it would be unreasonable for the Court to exercise jurisdiction. In the Ninth Circuit, "[t]he court examines seven factors to determine reasonableness: [1] the extent of purposeful interjection; [2] the burden on the defendant; [3] the extent of conflict with sovereignty of the defendant's state; [4] the forum state's interest in adjudicating the suit; [5] the most efficient judicial resolution of the dispute; [6] the convenience and effectiveness of relief for the plaintiff; and [7] the existence of an alter-

native forum." *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1198–99 (9th Cir.1988).

■ The first factor is closely tied with the purposeful direction analysis. *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d at 1199. Nonetheless, "[e]ven if there is sufficient 'interjection' into the state to satisfy the purposeful availment prong, the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction...." *Core–Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488 (9th Cir. 1993). Here, although the purposeful interjection is present, it does not appear to be particularly strong; NML does not, for example, have offices or other physical presence in the forum state. This factor tilts against reasonableness.

The second factor is something of a wash with the sixth, because convenience for the defendant will usually result in inconvenience for the plaintiff. Thus, this factor is usually more relevant to change of venue analysis than jurisdictional analysis. *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 386–87 (9th Cir.1990) *rev'd as to other matters sub nom. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991). The sixth factor is similarly given little weight, although some courts have distinguished between corporate and individual plaintiffs, as the latter do not necessarily have the "considerable resources" that would be needed to "litigate elsewhere." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1094 (C.D.Cal. 2003). Overall, these factors are neutral or tilt slightly in favor or reasonableness.

As to the third factor, the Court does not lightly consider exercising jurisdiction

---

9. *See also World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ("[I]f the sale of a product ... is not simply an isolated occurrence, but arises from the efforts of the manu-

facturer or distributor to serve directly or indirectly, the market for its product in [the forum state], it is not unreasonable to subject it to suit [there]....").

over a foreign corporation. "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi,* 480 U.S. at 115, 107 S.Ct. 1026. On the other hand, where, as here, the foreign entity exerts significant control over the manufacturing operations of a U.S. subsidiary and takes active steps to do business in the forum state, concerns about conflicts of sovereignty are reduced, because the foreign entity has volunteered to be subject to (as well as to benefit from) the laws of the forum state.[10]

■■■ The fourth factor strongly favors reasonableness. California has a significant interest in having the dispute resolved, because most of Plaintiffs' claims arise under California laws designed to protect California consumers from unfair business practices.[11]

Finally, efficiency of resolution and the existence of alternative fora are in this case linked. NML proposes no alternative forum in which this case could be heard, but on NML's theory that it is not subject to American jurisdiction at all, presumably Plaintiffs could only seek justice in a Japanese court. It is not clear that there exists a Japanese court that would enforce California consumer protection laws, but even if there were, both the Plaintiffs and

NNA would be massively hindered in presenting their cases, as the witnesses and physical evidence in this case are likely to be located primarily in the United States. These factors also support a finding of reasonableness.

Taken as a whole, the factors weigh in favor of finding that the exercise of personal jurisdiction over NML is reasonable in this case.

For all of the above reasons, the Court finds that it has personal jurisdiction over NML.

### B. Rule 8 Pleading

■■■ NML alleges that Plaintiffs have not adequately stated a claim against it because the SAC frequently "fail[s] to differentiate between [NML] and NNA" and "Plaintiff's claims are against NNA alone." (Mot. Dismiss Rule 12(b)(6) at 1:10, 1:22.) The latter point is, of course, the legal conclusion NML wishes to reach and cannot be assumed at this stage in the litigation, when the Court must presume that Plaintiffs' factual allegations are true. As to the former point, NML argues that because Plaintiffs frequently refer to NML and NNA collectively as "Nissan," the SAC lacks specificity.

---

**10.** NML points to the Supreme Court's recent call for U.S. courts to consider "international comity" and the theories of jurisdiction applied by other countries when deciding whether to assert jurisdiction. *Daimler AG v. Bauman,* —— U.S. ——, 134 S.Ct. 746, 763, 187 L.Ed.2d 624 (2014). However, NML identifies no particular Japanese notion of jurisdiction, nor any particular "consideration[ ] of international rapport," that counsels against exercising jurisdiction. *Id.*

**11.** Defendants argue that the California consumer protection statutes—the Consumers Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and Song–Beverly Consumer Warranty Act ("Song")—only ap-

ply to those with whom potential plaintiffs have had a direct transaction—essentially, the final seller. But that is not true—the California statutes allow manufacturer liability even if the manufacturer is not the retail seller. *See* Cal. Civ.Code § 1792 ("[E]very sale of consumer goods that are sold at retail in this state shall be accompanied by *the manufacturer's* and the retail seller's implied warranty that the goods are merchantable.") (emphasis added); *Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 588 (C.D.Cal.2011) (plaintiff could establish numerosity in class action against drug manufacturer under the CLRA and UCL by alleging that drug was sold in retail pharmacies around the state). *See* Part III.C. *infra.*

But plaintiffs routinely refer to defendants under some collective name, as it would be tedious to list each defendant separately every time one wished to make an allegation against them all. And Plaintiffs' SAC spells out in quite a bit of detail what NML or its agents or employees are alleged to have done. (SAC, ¶¶ 38–57 (describing NML's role in designing the allegedly faulty system).) To the degree that the SAC alleges actions taken by "Nissan," the Court reads that as it would any other complaint making allegations against defendants named collectively—either as an allegation that the defendants acted in concert or as a general allegation against all defendants (subject to narrowing after discovery), depending on the context.

## C. Rule 9(b) Pleading

NML also argues that Plaintiffs' pleadings against it are insufficiently specific to satisfy the pleading requirements of Rule 9(b), which states that "[i]n alleging fraud ... a party must state with particularity the circumstances constituting fraud...." NML argues that Plaintiffs' claims largely or entirely sound in fraud, and that they therefore must be pled "with particularity"—a phrase the Ninth Circuit has interpreted as meaning, essentially, "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation marks omitted). Specifically, NML argues that Rule 9(b) is not satisfied because (1) Plaintiffs' allegations do not adequately distinguish between NML and NNA generally and (2) Plaintiffs cannot assert that NML (as distinct from NNA) entered into a "transaction" with them.

 Although the Causes of Action speak somewhat broadly of actions taken by "Nissan," Plaintiffs' background allegations contain plenty of specifics as to acts NML is alleged to have taken separate from (and even in opposition to) NNA. In particular, ¶¶ 49–50 and ¶¶ 52–53 allege that specific officers at NML were aware of alleged flaws in the timing chain in 2003, declined to test a solution because of cost concerns, and "sought to bury the problems." These are the "who, what, when, where, and how of the misconduct," and they give NML adequate notice of the acts it is alleged to have committed. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir.2009) (the purpose of Rule 9(b) is "to give defendants notice of the particular misconduct so that they can defend against the charge") (ellipsis omitted). To the degree that "sought to bury the problems" is not perfectly precise, it is nonetheless sufficient for Rule 9(b) purposes to indicate that NML's officers undertook to hide reports of the alleged flaw. "[I]n cases of corporate fraud, the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987).

 NML also argues that Plaintiffs cannot show that they have entered into a "transaction" with it, which it claims is required for a claim under the consumer protection statutes. It is true that a common law fraud claim requires a direct relationship, such as that of a "seller and buyer," between the manufacturer and the plaintiff. *LiMandri v. Judkins*, 52 Cal. App.4th 326, 336–37, 60 Cal.Rptr.2d 539 (1997). But "[w]hile ... tort standards at times may be relevant to a court's evaluation of CLRA actions," that does not mean "that CLRA actions must fulfill the same elements as common law fraud claims." *Chamberlan v. Ford Motor Co.*, 369 F.Supp.2d 1138, 1144 (N.D.Cal.2005). There are "numerous cases supporting [the] contention that a direct sale is not required to allege a CLRA claim." *Rossi v. Whirlpool Corp.*, No. 2:12–CV–00125,

2013 WL 5781673, at \*10 (E.D.Cal. Oct. 25, 2013). "[T]he CLRA's protection extends to the manufacturer as well, regardless of whether the consumer dealt directly with the manufacturer." *Id. See also Mc-Adams v. Monier, Inc.*, 182 Cal.App.4th 174, 188, 105 Cal.Rptr.3d 704 (2010) ("A cause of action for unfair competition under the UCL may be established independent of any contractual relationship between the parties."). The Court concludes that a manufacturer that is not the direct seller may be held liable for failure to disclose material defects under the CLRA and the UCL, although not for common law fraud.[12]

Nonetheless, not just any failure to disclose a defect can support a claim against a manufacturer under the CLRA and UCL. Only when the manufacturer has a specific obligation to disclose the defect can a plaintiff allege actionable fraud under the statutes. An obligation arises when a defendant manufacturer "had exclusive knowledge of material facts not known to the plaintiff," and/or "actively conceal[ed] a material fact from the plaintiff." *Smith v. Ford Motor Co.*, 749 F.Supp.2d 980, 987 (N.D.Cal.2010) *aff'd*, 462 Fed.Appx. 660 (9th Cir.2011). Apart from a warranty obligation, for the fact of a defect to be "material," it must involve a "safety issue." *Id.* Thus, under California law, a manufacturer can be sued under the CLRA and/or the UCL if it had exclusive knowledge of a safety-related defect or if it actively concealed such a defect.

Plaintiffs have alleged that the timing chain defect in this case "places the driver and passengers at a risk of harm .... What the Timing Chain Tensioning System fails, it can cause ... the inability to accelerate and maintain speed, as well as catastrophic engine failure .... [O]ccu-

pants of the vehicles are exposed to rear end collisions and other accidents ...." (SAC, ¶ 10.) This allegation, combined with allegations that NML knew of the alleged defect and that it attempted to conceal the defect, are sufficiently particular to allege an obligation to disclose and therefore to state a claim under the statutes.

Thus Plaintiffs can assert statutory causes of action against NML, apart from the final sales transaction that they may have entered into with NNA. The common law fraud claim, however, may be asserted only against NNA—at least on the facts currently pled.

## IV. CONCLUSION

The Court DENIES the motions to dismiss as to all claims except the Fifth Cause of Action (Fraud), which is DISMISSED as to NML.

IT IS SO ORDERED.

---

12. To the extent that NML's argument rests on the contention that it is not the "manufacturer" of the vehicles or components in ques-

tion, the Court has already rejected that argument above.